T.C. Memo. 1996-470


UNITED STATES TAX COURT


JANICE L. MORRIS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4838-95.                    Filed October 21, 1996.


<u>Phillip H. Hamilton</u> and <u>John J. Vassen</u>, for petitioner.

<u>Darrell C. Weaver</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following defi-

ciencies in petitioner's Federal income tax:[1]

---

[1]  In the notice of deficiency (notice), which was issued to both petitioner and her former husband, David E. Morris, Jr. (Mr. Morris or DEM), respondent determined (1) deficiencies in income tax with respect to both of them and (2) additions to tax for fraud only with respect to Mr. Morris.  Mr. Morris filed his own petition with the Court in docket No. 4839-95.  The Court entered
                                        (continued...)

| Year | Deficiency |
|------|------------|
| 1987 | $39,011 |
| 1988 | 23,059 |
| 1989 | 29,594 |

The issues remaining for decision are:

(1)  Is petitioner entitled to innocent spouse relief under section 6013(e)(1)[2] with respect to the portion of the deficiency for each of the years 1987, 1988, and 1989 that is attributable to certain income from funds that Mr. Morris embezzled and that were not reported in the joint return that they filed for each such year?   We hold that she is.

(2)  Is petitioner entitled to innocent spouse relief under section 6013(e)(1) with respect to the portion of the deficiency for 1987 that is attributable to deductions for a business bad debt and the legal expenses incurred in attempting to recover that debt that were claimed in the joint return for that year? We hold that she is not.

(3)  Did petitioner and Mr. Morris underreport by $10,000

---

[1](...continued)
a decision in that case, which was based upon an agreement between Mr. Morris and respondent that Mr. Morris is liable for deficiencies in income tax and additions to tax for fraud due in part to the omission of certain income attributable to embezzled funds from the Federal income tax returns (joint returns) that he and petitioner filed for the years at issue.  Mr. Morris did not join in the petition filed by petitioner and is not a party in the present case.

[2]  All section references are to the Internal Revenue Code (Code) in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

their gross income for 1989 from Meadows Management, Inc. (Meadows), an S corporation?  We hold that they did.

(4)  Did Mr. Morris receive during 1989 a constructive dividend in the amount determined by respondent from Accu-Data, Inc. (Accu-Data)?  We hold that he did.

(5)  Has the period of limitations for assessment of tax for 1987 expired as to petitioner?[3]  We hold that it has not.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner resided in Monticello, Illinois, at the time the petition was filed.

### Mr. Morris' Embezzlement of Funds

During the early to mid-1970's, Mr. Morris was employed by the Internal Revenue Service as a revenue agent.  Thereafter, beginning in 1977 and throughout the years at issue, Mr. Morris was employed by John Kenny Co., Inc. as an accountant.[4]  Mr. Morris terminated his employment with John Kenny Company on December 15, 1990.

Mr. Morris began embezzling funds (embezzled funds) from John Kenny Company several years prior to 1987.  During all

---

[3]  Petitioner advances no argument about the statute of limitations applicable to 1988 and 1989, and we consider petitioner to have abandoned any argument with respect thereto.

[4]  The record refers interchangeably to Mr. Morris' employer as, inter alia, John Kenny, John Kenny Construction, and John Kenny Co., Inc.  We shall refer to his employer as John Kenny Company.

relevant years, Mr. Morris' embezzlement scheme involved his depositing funds belonging to John Kenny Company into the bank accounts of the following corporations and other entities that he controlled: Accu-Data; Illinois Land Trust No. 031-663-768, Champaign National Bank, Trustee (Trust 768); Meadows; and Mid Central Illinois Co. (MCIC). During the years 1987, 1988, and 1989, Mr. Morris embezzled $70,547, $73,185, and $43,101, respectively, from John Kenny Company that was not reported in the respective joint returns for those years (unreported embezzlement income).[5]

---

[5] In the notice, respondent determined that Mr. Morris embezzled $102,972.40, $128,092.34, and $129,046.26 during 1987, 1988, and 1989, respectively, and that, of the total funds that he embezzled during each of those years, Mr. Morris reported $32,425 as gross receipts of Accu-Data during 1987, $54,907.13 as gross receipts of Accu-Data and Meadows during 1988, and $85,944.95 as gross receipts of Accu-Data and Meadows during 1989. Respondent further determined that the differences (1) for 1987 between the total amount of embezzled funds and the amount of such funds reported in the corporate returns of Accu-Data covering 1987 and (2) for each of the years 1988 and 1989 between the total amount of embezzled funds and the aggregate amount of such funds reported in the corporate returns of Accu-Data and Meadows covering those years were the amounts of such funds that were omitted from the joint returns that petitioner and Mr. Morris filed for those years (viz., $70,547 for 1987, $73,185 for 1988, and $43,101 for 1989). In determining how much of the embezzled funds Mr. Morris reported for 1987 as gross receipts of Accu-Data, respondent added one-half of the gross receipts reported in the U.S. corporation short-form income tax return (Form 1120-A) that Accu-Data filed for its taxable year ended June 30, 1986, and one-half of the gross receipts of $35,211 reported in the Form 1120-A that it filed for its taxable year ended June 30, 1987, and reduced that sum by certain income of Accu-Data that she determined did not relate to the embezzled funds. Similarly, in determining how much of the embezzled funds Mr. Morris reported as gross receipts of Accu-Data (1) for 1988, respondent added one-half of the gross

(continued...)

It was not until either late January or early February 1991 that petitioner discovered that Mr. Morris had embezzled funds from John Kenny Company. On August 6, 1991, petitioner and Mr. Morris were divorced, principally because of Mr. Morris' embezzlement activities.

It was not until January 1991 that John Kenny Company discovered that Mr. Morris had been embezzling funds. In February 1991, John Kenny Company and/or its owner, John Kenny, sued petitioner and Mr. Morris to recover the embezzled funds. That suit was settled in May 1991. As part of that settlement, the beneficial interest in certain land located in Illinois that Meadows held was transferred to John Kenny Company.

Corporations and Other Entities
that Mr. Morris Controlled

---

[5](...continued)
receipts of $31,687 reported in the Form 1120-A that it filed for its taxable year ended June 30, 1988, and all of the gross receipts of $20,647 reported in the U.S. income tax return for an S corporation (Form 1120S) that it filed for its short taxable year 1988, and reduced that sum by certain income of Accu-Data for 1988 that she determined did not result from the embezzled funds; and (2) for 1989, respondent used all of the gross receipts of $6,000 reported in the Form 1120S that it filed for its taxable year 1989, as reduced by certain income of Accu-Data for that year that she determined did not result from the embezzled funds. In determining how much of the embezzled funds Mr. Morris reported as gross receipts of Meadows (1) for 1988, respondent used all of the gross receipts of $22,482 reported in the Form 1120S that it filed for its taxable year 1988, as reduced by certain income of Meadows for that year that she determined did not result from the embezzled funds; and (2) for 1989, respondent used all of the gross receipts of $86,355 reported in the Form 1120S that it filed for its taxable year 1989, as reduced by certain income of Meadows for that year that she determined did not result from the embezzled funds.

Accu-Data

On December 16, 1980, Mr. Morris incorporated Accu-Data for the purpose of operating an accounting and tax return preparation business.  He was the sole stockholder of Accu-Data until its involuntary dissolution on May 1, 1992.  During the years at issue, (1) Mr. Morris maintained a checking account on behalf of Accu-Data at the Champaign National Bank (Accu-Data account) on which he was the sole signatory and into which he deposited certain of the embezzled funds; and (2) petitioner had no involvement with Accu-Data or that account.

As president of Accu-Data, Mr. Morris signed the Form 1120-A that it filed for its taxable year ended June 30, 1988, and the Forms 1120S that it filed for its taxable years 1988 and 1989.[6]

Trust 768

Trust 768 was created on November 23, 1987.  At that time, the beneficial interests in Trust 768 were held equally by (1) John Kenny Company and (2) petitioner and Mr. Morris.  On February 9, 1988, John Kenny Company assigned its beneficial

---

[6]  Prior to July 1, 1988, Accu-Data was not an S corporation, and it had a taxable year that ended on June 30.  It appears that Accu-Data became an S corporation on July 1, 1988, and thereafter adopted the calendar year as its taxable year.  The Form 1120S that Accu-Data filed for its taxable year 1988 covered the last six months of that year.

Mr. Morris prepared the Form 1120-A that Accu-Data filed for its taxable year ended June 30, 1988.  It is unclear from the record who prepared the Forms 1120S that Accu-Data filed for 1988 and 1989.

interest in Trust 768 to petitioner.

During February 1988, Trust 768 purchased for $85,000 61 acres of land situated in Piatt County, Illinois (Illinois land), on which a gravel and sand pit (gravel pit) was located.  To facilitate that purchase, Trust 768 borrowed $50,000 from Champaign National Bank, and Mr. Morris wrote a check for $20,000 to Trust 768 drawn on a joint checking account that petitioner and Mr. Morris maintained at the First State Bank of Monticello (joint checking account).[7]

On June 15, 1988, petitioner and Mr. Morris assigned their beneficial interests in Trust 768 to Meadows.  Thereafter, Trust 768 conducted no activities except for maintaining a bank account at the Champaign National Bank (Trust 768 account) on which Mr. Morris was the sole signatory and into which he deposited certain of the embezzled funds.

Meadows

Meadows, which was incorporated on May 2, 1988, was involuntarily dissolved on October 1, 1991.  During the years at issue, petitioner was Meadows' sole stockholder, served as its president, signed certain corporate documents on its behalf, was a signatory on a checking account maintained on its behalf at the National Bank of Monticello in the name of petitioner and Mr. Morris (Meadows account at the National Bank of Monticello), and

---

[7]  The record does not disclose the source of the remaining $15,000 that Trust 768 used to purchase the Illinois land.

signed at least one check drawn on that account. However, during those years, Mr. Morris controlled the affairs of Meadows, and petitioner was not involved in the day-to-day operations of that corporation and was not in a position to know how much income Meadows generated from those operations.

In addition to the Meadows account at the National Bank of Monticello, Mr. Morris maintained a checking account in the name of Meadows at the Champaign National Bank (Meadows account at the Champaign National Bank) on which he and petitioner were signatories and into which he deposited certain of the embezzled funds.

During 1988 and 1989, Meadows sold to unrelated persons the sand and gravel located in the gravel pit and deposited the proceeds from those sales into the Meadows account at the National Bank of Monticello.

Petitioner visited the Illinois land during 1988 and 1989, observed children playing around the gravel pit, and became concerned that those children might sustain injuries for which Meadows might be held liable. She therefore suggested that a liability insurance policy be obtained to cover the Illinois land. During 1989, petitioner signed an insurance application for such a policy in which she indicated that the applicant's primary occupation was "Accountant". Petitioner signed a check for $100 drawn on the Meadows account at the Champaign National Bank that was used to pay a premium for that policy.

The Form 1120S that Meadows filed for 1988 was signed by Mr.

Morris as its secretary,[8] and he prepared the Form 1120S filed by Meadows for 1989 and signed it as its secretary-vice president.

MCIC

During the years at issue, except for maintaining a checking account at the Champaign National Bank (MCIC account) on which Mr. Morris was the sole signatory and into which Mr. Morris deposited certain of the embezzled funds, MCIC conducted no activities.

The Financial Situation of
Petitioner and Her Family

Petitioner and Mr. Morris, who were married on December 23, 1967, have a son and a daughter. During the years at issue, petitioner was responsible for handling the family finances. In that connection, she deposited checks and other funds into the joint checking account and/or the joint savings account (joint savings account) that Mr. Morris and she maintained at the First State Bank of Monticello (joint checking and/or savings accounts) and used the funds in those accounts to pay the family bills.

For each of the years 1987, 1988, and 1989, petitioner prepared (1) an analysis of the amounts deposited into (deposits analysis) and (2) an analysis of the amounts disbursed from (disbursements analysis) the joint checking and/or savings accounts.

---

[8] It is unclear from the record who prepared the Form 1120S that Meadows filed for 1988.

Deposits

According to the deposits analyses that petitioner prepared

for the years at issue, petitioner made the following deposits

into the joint checking account during those years:

| Year | DEM Checks | DEM Payroll Checks | Other Checks | Cash Deposited | Savings Deposited | Wages Etc. Checks | Less Cash Received | Net Deposits[9] |
|------|-----------|--------------------|--------------|----------------|-------------------|-------------------|--------------------|----------------|
| 1987 | $6,350.00 | $23,840.95 | $2,730.40 | $1,655.00 | $ -- | $614.74 | $4,806.00 | $76,458.55 |
| 1988 | 29,850.91 | 24,361.78 | 95.50 | 270.00 | 6,473.00 | 1,845.36 | 3,082.00 | 59,683.55 |
| 1989 | 15,324.00 | 23,176.29 | 1,920.88 | 2,300.00 | 23,673.44 | 3,690.85 | 3,112.43 | 67,227.68 |

The items under the heading "DEM Checks" were checks drawn

on the Accu-Data account, the Trust 768 account, the Meadows

account at the Champaign National Bank, and/or the MCIC account

that Mr. Morris gave petitioner and that she deposited.  The

items under the heading "DEM Payroll Checks" were payroll checks

that Mr. Morris received from John Kenny Company, endorsed, and

gave petitioner and that she deposited.  The items under the

heading "Other Checks" were checks that petitioner received from

miscellaneous sources that she deposited.  The items under the

heading "Cash Deposited" were cash that petitioner received from

---

[9]  The amount under the heading "Net Deposits" for each of the
years at issue that was shown in the deposits analysis for each
such year is not equal to the amount obtained by reducing the
total of all the deposits shown in each such deposits analysis by
the amount shown under the heading "Less Cash Received".  The
amounts under the heading "Net Deposits" are overstated by
$46,073.46 for 1987 and $254.65 for 1989 and are understated by
$131 for 1988.  The reasons for those discrepancies are not
disclosed by the record, although part of the discrepancy for
1987 is attributable to three deposits totaling $46,063 that were
included under the heading "Net Deposits" for that year but that
were not included under any other heading.  Of that $46,063,
$39,800 is attributable to a bonus that Mr. Morris received
during 1987 from John Kenny Company and $4,000 is attributable to
a check drawn on the Accu-Data account during that year.  The
source of the remaining $2,263 is not disclosed by the record.

various sources not identified in the record and that she deposited. The items under the heading "Savings Deposited" were withdrawals that petitioner made from the joint savings account and that she deposited.[10] The items under the heading "Water Co. Checks" were checks that Mr. Morris received as salary from Douglas Water Co., a company owned by John Kenny, and gave to petitioner and that she deposited. The items under the heading "Less Cash Received" were cash that petitioner retained, and did not deposit, at the time certain of the deposits listed above were made.

Although petitioner's deposits analysis for 1987 showed deposits totaling $6,350 under the heading "DEM Checks", checks totaling $11,775 that were all drawn on the Accu-Data account were paid to the order of petitioner, Mr. Morris, or cash and represent amounts received by or expended on behalf of petitioner during 1987. Of the $5,425 in checks that were deposited but not shown in the deposits analysis for 1987 under the heading "DEM

---

[10] Withdrawals from the joint savings account during 1987, 1988, and 1989 totaled $2,263, $6,473, and $20,237.23, respectively. Since petitioner did not show in her deposits analysis for 1987 under the heading "Savings Deposited" any deposits into the joint checking account of funds withdrawn from the joint savings account during that year, it appears that Mr. Morris, and not petitioner, made the withdrawals from that account during 1987. The record does not explain the discrepancy between the total amount of withdrawals from the joint savings account during 1989 of only $20,237.23 and the withdrawals totaling $23,673.44 that petitioner showed in her deposits analysis for that year under the heading "Savings Deposited" as having been made from that account during 1989 and deposited into the joint checking account.

Checks", (1) $4,000 was included in that deposits analysis under the heading "Net Deposits", but the source was not disclosed; and (2) at least $1,100 was included in that deposits analysis under the heading "Other Checks".

Although petitioner's deposits analysis for 1987 showed deposits totaling $614.74 under the heading "Water Co. Checks", Mr. Morris received a total of $6,500 from Douglas Water Co. during 1987, and that amount was received by or expended on behalf of petitioner during that year.

During 1987, Mr. Morris received a $40,000 bonus (bonus) from John Kenny Company that was not attributable to embezzled funds. Of that amount, $39,800 was deposited into the joint checking account and was included in the deposits analysis for 1987 under the heading "Net Deposits", although the source of that deposit was not disclosed in that analysis.

Although petitioner's deposits analysis for 1988 showed deposits totaling $29,850.91 under the heading "DEM Checks", checks totaling $31,144.91 that were drawn on the Accu-Data account, the Trust 768 account, the Meadows account at the Champaign National Bank, and the MCIC account were paid to the order of petitioner, Mr. Morris, or cash and represent amounts received by or expended on behalf of petitioner during that year.[11]

---

[11] The checks totaling $31,144.91 had the following sources:

(continued...)

Although petitioner's deposits analysis for 1989 shows deposits totaling $15,324 under the heading "DEM Checks", checks totaling $18,144 that were drawn on the Accu-Data account, the Meadows account at the Champaign National Bank, and the MCIC account were paid to the order of petitioner, Mr. Morris, or cash and represent amounts received by or expended on behalf of petitioner during that year.[12]

Disbursements

According to the disbursements analyses that petitioner prepared for the years at issue, petitioner made the following disbursements from the joint checking account during those years:

| Category of Disbursements[13] | 1987 | 1988 | 1989 |
|---|---|---|---|
| Savings | $950.00 | $17,006.00 | $28,583.25 |

---

[11](...continued)

| Entity Controlled by Mr. Morris | 1988 |
|---|---|
| Accu-Data | $21,875.00 |
| Trust 768 | 3,969.91 |
| Meadows | 750.00 |
| MCIC | 4,550.00 |
| Total | 31,144.91 |

[12]  The checks totaling $18,144 had the following sources:

| Entity Controlled by Mr. Morris | 1989 |
|---|---|
| Accu-Data | $6,350 |
| Meadows | 9,974 |
| MCIC | 1,820 |
| Total | 18,144 |

[13]  The categories listed are similar to those that appeared in petitioner's disbursements analyses.

| | | | |
|---|---:|---:|---:|
| Cash | 2,408.00 | 4,673.30 | 7,645.50 |
| Insurance | 2,052.73 | 3,111.35 | 4,224.81 |
| Food | 886.79 | 2,177.33 | 1,738.06 |
| Gasoline and repair | 382.29 | 1,606.76 | 3,411.89 |
| Medical | 1,008.87 | 813.76 | 863.43 |
| Daughter Cindy | 237.00 | 450.00 | 720.00 |
| Clothing | 2,363.37 | 2,506.10 | 1,955.08 |
| Monthly | 11,558.51 | 9,479.53 | 10,665.27 |
| Miscellaneous | 53,961.74 | 17,080.04 | 7,636.66 |
| Total | 75,809.30 | 58,904.17 | 67,443.95 |

The category "Savings" reflected funds that petitioner transferred to the joint savings account or other savings accounts. Of the $28,583.25 that was transferred to one or more savings accounts during 1989, $20,000 was deposited as part of an initial deposit totaling $35,000 that petitioner and Mr. Morris made in order to open an account at American Savings.[14]  The category "Cash" reflected funds that petitioner received from cashing checks that were payable to cash.  The category "Insurance" reflected checks that petitioner wrote to pay premiums for homeowners', automobile, and medical insurance.  The category "Gasoline and repair" reflected funds that petitioner spent for car expenses.  The category "Medical" reflected funds that petitioner spent for various medical expenses, including medical insurance premiums.[15]  The category "Daughter Cindy" reflected

_____

[14]  The remaining $15,000 that was used to make that initial $35,000 deposit into the American Savings account was from the Meadows account at the National Bank of Monticello.  Petitioner did not receive or have available any of the money deposited into the American Savings account; Meadows used that money for the gravel pit.

[15]  It is unclear from the record why premiums for medical insur-

(continued...)

funds that petitioner spent on her daughter Cindy.  The category
"Clothing" reflected funds that petitioner spent to purchase
clothing.  The category "Monthly" reflected funds that petitioner
spent to pay items such as utilities, credit card accounts, car
expenses,[16] and mortgage payments.  Included in the category
"Monthly" for 1987 were five checks, each in the amount of
$250.32, that were written by petitioner to GMAC during each of
the months January through May 1987 and one check in the amount
of $250.31 that was written by petitioner to GMAC in June 1987.
The category "Miscellaneous" reflected funds that petitioner
spent on various items, including haircuts, birthday presents,
tuition, contributions to organizations such as the Boy Scouts
and a Methodist church, and purchases at stores such as K's
Merchandise Mart and GNC.  The category "Miscellaneous" for 1987
reflected, inter alia, (1) funds totaling $17,560.77 that peti-
tioner used to pay off the mortgage on the house at which peti-
tioner, Mr. Morris, and their children resided and (2) a $20,000
check payable to Trust 768 that was written by Mr. Morris with
respect to that trust's purchase of the Illinois land.  The
source of the funds used to pay off the mortgage and to purchase
the Illinois land was the $40,000 bonus that John Kenny Company

---

[15](...continued)
ance were listed in two separate categories in the disbursements
analyses.

[16]  It is unclear from the record why car expenses were listed in
two different categories in the disbursements analyses.

paid Mr. Morris during 1987.  The category "Miscellaneous" for 1987 also reflected a $6,263.50 disbursement to Bill Abbott on May 12, 1987.  That disbursement was the downpayment that petitioner made to purchase a 1987 Sunbird, which was the only car available to her at that time.  Petitioner borrowed the balance of the purchase price for that car.

The disbursements that petitioner made during the years at issue were not lavish in comparison to the disbursements that she made during years prior to the years at issue.

Other Deposits, Disbursements, and Transfers

In addition to the deposits into the joint checking account that were reflected in petitioner's deposits analyses, certain deposits were also made to the joint savings account.  The total amounts deposited into that account during 1987, 1988, and 1989 were $5,015.82, $16,865.45, and $3,432.41, respectively.

During 1988, Mr. Morris wrote (1) two checks totaling $17,011 on the Trust 768 account to pay the joint Federal income tax liabilities that petitioner and he owed for 1986 and 1988 and (2) three checks totaling $2,853.72 on the Trust 768 account to pay the joint income tax liabilities that petitioner and he owed the State of Illinois for 1986 and 1988.[17]

---

[17]  The joint Federal and State income tax liabilities for 1986 that Mr. Morris paid during 1988 were attributable to the increase in taxes shown in an amended joint return that petitioner and Mr. Morris filed for 1986, and the joint Federal and State income tax liabilities for 1988 that Mr. Morris paid during that

(continued...)

Accu-Data made three payments to GMAC, each in the amount of $250.32, on July 10, August 6, and September 10, 1987. It also paid GMAC $4,464.64 on September 11, 1987, and $10 on September 24, 1987.

Mr. Morris transferred to petitioner ownership of a life insurance policy with a cash value of $15,000.[18]

Petitioner's Education, Work
Experience, and Family Life

Although petitioner had worked during 1981 and 1982 as an accounts receivable clerk at a medical supply company, she was not employed during the years at issue. Rather, during those years, petitioner was a homemaker, mother, and part-time college student.

During the fall of 1982, petitioner, who had not had any post-high school education, entered Parkland College. She took courses there over the next several years, including two introductory courses in basic accounting principles, and received a degree from that institution in the spring of 1987. In the fall of 1987, petitioner entered the University of Illinois and took courses there for two years, including two intermediate accounting courses, before she withdrew to devote more time to her children. Sometime after the years at issue, petitioner returned

---

[17](...continued)
year were attributable to estimated tax payments.

[18] The record does not disclose when that policy was transferred to petitioner.

to the University of Illinois and received a degree in accounting from that institution.

During December 1988, petitioner's daughter experienced a medical problem with which her daughter had a difficult time coping, and petitioner devoted a significant amount of time during 1989 in helping her daughter deal with that problem. Petitioner spent a substantial amount of time during the years at issue in assisting her son, who suffered from a learning disability, to improve his learning skills.

During the years at issue, Mr. Morris was not at home very much, and he took affirmative steps to deceive petitioner and otherwise to prevent her discovery of the embezzled funds. Mr. Morris led petitioner to believe that, when he was not at home, he was working not only for John Kenny Company, but also for Accu-Data during the evenings and on weekends at an office that he maintained away from home in an apartment complex. Although Mr. Morris discussed his employment with petitioner in terms of the people with whom he worked, he generally did not inform her about what he actually did in his employment. Mr. Morris was not open with petitioner about his financial affairs, and, when she questioned him about those matters, he reacted negatively, causing her to discontinue that line of questioning.

Joint Returns

For each of the years at issue, petitioner and Mr. Morris filed a joint return that Mr. Morris had prepared. They claimed their children as dependents in the 1987 and 1988 joint returns and claimed their son as a dependent in their 1989 return.

In the joint returns for the years 1987 through 1989, petitioner and Mr. Morris reported, inter alia, the following income (and loss):

|  | 1987 | 1988 | 1989 |
|---|---|---|---|
| Wages, salaries, etc. | $41,376.64 | $38,101.00 | $37,700.00 |
| Taxable interest | 2,147.99 | 2,758.00 | 5,450.00 |
| Schedule C | (447.25) | -- | -- |
| Schedule D | (3,000.00) | (3,000.00) | (3,000.00) |
| Schedule E | -- | 24,929.00 | 18,987.00 |
| Total income | 40,077.38 | 62,788.00[19] | 59,137.00 |

The category "Schedule C" reflects the results shown in Schedule C of the joint return for 1987. Petitioner and Mr. Morris included in that schedule the $40,000 bonus that Mr. Morris received from John Kenny Company during that year. That bonus income was completely offset by deductions that they claimed in that schedule.

The category "Schedule E" reflects the results shown in the respective Schedules E of the joint returns for 1988 and 1989. Petitioner and Mr. Morris included in those schedules the amounts of ordinary income (or loss) from a trade or business activity

---

[19]  The joint return for 1988 incorrectly showed total income of $62,083.

that was shown in the respective Forms 1120S that Accu-Data and Meadows, S corporations, filed for those years.[20] In Schedule E of the joint return for each of the years 1988 and 1989, they reported aggregate income from Accu-Data and Meadows of $24,929 and $18,987, respectively.

No income attributable to Accu-Data was reflected in the joint return for 1987, and no income attributable to MCIC or Trust 768 was reflected in the joint return for any of the years at issue.

Mr. Morris received Forms W-2 (Wage and Tax Statement) from John Kenny Company and Douglas Water Co. for each of the years at issue that were attached to the joint returns for those years and that showed the following:

---

[20] Although petitioner and Mr. Morris included in Schedule E of their joint return for 1989 only $19,112 of income from Meadows, the Form 1120S filed by Meadows for that year reflected $29,112 of income.

|                          | 1987 | 1988 | 1989 |
|--------------------------|------|------|------|
| **John Kenny Co.**       |      |      |      |
| Wages                    | $34,876.64 | $31,351.34 | $31,200.00 |
| Federal tax withheld     | 4,935.09 | 4,236.30 | 4,200.04 |
| State tax withheld       | 811.42 | 732.90 | 803.14 |
| Social Security tax withheld | 2,493.68 | 2,354.49 | 2,343.12 |
| **Douglas Water Co.**    |      |      |      |
| Wages                    | 6,500.00 | 6,750.00 | 6,500.00 |
| Federal tax withheld     | 542.00 | 540.00 | 520.00 |
| State tax withheld       | 160.68 | 166.86 | 160.68 |
| Social Security tax withheld | 464.62 | 506.98 | 488.06 |

After withholding for various taxes, Mr. Morris received during 1987, 1988, and 1989, respectively, (1) net wages (a) from John Kenny Company of $26,636.45, $24,027.65, and $23,853.70 and (b) from Douglas Water Co. of $5,332.70, $5,536.16, and $5,331.26 and (2) total net wages from both of those companies of $31,969.15, $29,563.81, and $29,184.96.

Petitioner relied on Mr. Morris to prepare the joint returns for the years at issue, had confidence in his ability to prepare those returns properly, and, as far as petitioner knew, Mr. Morris never received any complaints about the returns that he prepared for others.

Criminal Charges of Tax Evasion
Against Mr. Morris

On December 30, 1992, Mr. Morris pleaded guilty to two counts of tax evasion under 26 U.S.C. section 7201 (1994) for not reporting as income in the joint returns for 1987 and 1988

certain funds that he had embezzled and that had not been reported as gross receipts of Accu-Data or Meadows.

Bad Debt and Legal Expenses

Petitioner and Mr. Morris claimed deductions of $37,596 for a business bad debt and $2,851.25 for legal expenses in Schedule C of their 1987 joint return. Those deductions completely offset the $40,000 bonus that Mr. Morris had received during 1987 and reported in that schedule. The activity reported in Schedule C of the 1987 joint return was identified as "financial services".

The business bad debt deduction claimed in Schedule C of the joint return for 1987 was attributable to a loan (Galt loan) made by Mr. Morris, who was not in the business of making loans during that year, or by one of the entities that he controlled to either Tom Galt (Mr. Galt) or Galt Communications, Inc. (Galt Communications). Galt Communications, a corporation owned 80 percent by Mr. Galt and 20 percent by Mr. Morris, was established for the purpose of selling electronic appliances and cellular telephone services. At the time the Galt loan was made, Mr. Morris was not an employee of Galt Communications, but he hoped to secure future employment with it.

The legal expenses claimed as a deduction in Schedule C of the 1987 joint return were incurred during an unsuccessful attempt to recover the proceeds of the Galt loan.

Petitioner inquired about the $37,596 business bad debt deduction claimed in the 1987 joint return because she thought

that that debt had been deducted in the 1986 joint return. Mr. Morris confirmed that that debt had been deducted, albeit erroneously, in their 1986 joint return and advised her that they would have to file an amended joint return for 1986 to correct that error. Petitioner and Mr. Morris filed an amended joint return for 1986 that did not claim the business bad debt deduction at issue.

Meadows--Gross Income

The Form 1120S that Meadows filed for 1989 showed gross receipts of $86,355 and ordinary income of $29,112. In their joint return for 1989, petitioner and Mr. Morris reported income from Meadows in the amount of $19,112.

On April 6, 1989, a deposit of $21,000 attributable to a check drawn on the MCIC account was made into the Meadows account at the Champaign National Bank. A $10,000 check drawn on the Meadows account at the Champaign National Bank and payable to the order of Mr. Morris cleared that account on April 17, 1989. That $10,000 check and a check payable to Mr. Morris in the amount of $16,500 that was drawn on the MCIC account were deposited on April 14, 1989, into an account at Bloomington Federal (Bloomington Federal account). On April 26, 1989, a $23,000 deposit was made into the Meadows account at the Champaign National Bank attributable to a check drawn on the Bloomington Federal account.

Accu-Data--Constructive Distribution

Accu-Data, a corporation wholly owned by Mr. Morris during all relevant periods, was a stockholder in Technical Programs, Inc. (TPI). During 1981, Accu-Data transferred $12,000 to TPI. During 1982, Accu-Data transferred an additional $300 to TPI. Between 1981 and 1983, TPI made payments to and on behalf of Accu-Data that totaled at least $5,045. TPI was dissolved on February 1, 1986, because of its failure to pay franchise tax to the State of Illinois.

The Form 1120S that Accu-Data filed for its short taxable year July 1 through December 31, 1988, reflected as an asset on its balance sheet at the beginning of the year "Loans to shareholders" (stockholder loan account) in the amount of $7,217. No amount was reflected on the balance sheet at the end of that year concerning those purported loans. The balance sheet in the Form 1120S that Accu-Data filed for 1989 showed no assets and liabilities as of the beginning and end of that year. The Form 1120-A that Accu-Data filed for its taxable year ended June 30, 1987, contained a balance sheet that showed that the stockholder loan account increased from $4,394 to $7,217 during that year. The Form 1120-A that Accu-Data filed for its taxable year ended June 30, 1988, contained a balance sheet that showed a balance of $7,217 in the stockholder loan account at the beginning and end of that year.

## OPINION

Petitioner bears the burden of proving that respondent's determinations in the notice are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). To satisfy that burden with respect to the issues remaining in this case, petitioner relies on her testimony and that of Mr. Morris, as well as on various documents. We do not question the general credibility of petitioner.[21] However, as discussed below, we do have reservations about some of the matters to which Mr. Morris testified.

Innocent Spouse

Petitioner claims that she qualifies for innocent spouse relief under section 6013(e) only with respect to the portion of the deficiency (1) for 1987 that is attributable to the unreported embezzlement income and the erroneous deductions claimed for a business bad debt and the legal expenses incurred to recover that debt and (2) for each of the years 1988 and 1989 that is attributable to the unreported embezzlement income.

Section 6013(e) provides in pertinent part:

(e) Spouse Relieved of Liability in Certain Cases.--

---

[21] During her direct testimony, petitioner testified that she did not write any checks on the Meadows bank accounts. On cross-examination, respondent introduced a check written by petitioner on the Meadows account at the Champaign National Bank. We believe petitioner's testimony that she did not remember writing that check and do not question the reliability of her testimony as a result of that, or any other, lapse of memory during her testimony.

(1) In general.--Under regulations prescribed by the Secretary, if--

> (A) a joint return has been made under this section for a taxable year,

> (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

> (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and

> (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial under-statement.

(2) Grossly Erroneous Items.--For purposes of this subsection, the term "grossly erroneous items" means, with respect to any spouse--

> (A) any item of gross income attributable to such spouse which is omitted from gross income, and

> (B) any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law.

The spouse claiming innocent spouse relief must prove that all four requirements prescribed by section 6013(e)(1) are satisfied in order to be entitled to such relief.[22]  <u>Resser v.</u>

---

[22] Neither party advances any argument regarding sec.

(continued...)

Commissioner, 74 F.3d 1528, 1534 (7th Cir. 1996), revg. and remanding T.C. Memo. 1994-241. Nonetheless, the innocent spouse provision was intended to provide relief from "grave injustice" and is to be applied liberally in favor of the person claiming its benefits. Id.

Respondent concedes (1) that petitioner and Mr. Morris filed a joint return for each of the years at issue; (2) that there was a substantial understatement of tax (substantial understatement) with respect to each of those joint returns; (3) that the unreported embezzlement income for each of the years at issue constitutes a grossly erroneous item that is attributable to Mr. Morris; and (4) that petitioner did not know about the funds that Mr. Morris embezzled during those years until late January or early February 1991 after she signed the joint return for each of those years. Respondent argues, however, (1) that neither of the erroneous deductions in question for 1987 constitutes, as required by section 6013(e)(1)(B), a grossly erroneous item as defined in section 6013(e)(2)(B); (2) that petitioner had reason to know within the meaning of section 6013(e)(1)(C) of the substantial understatement (a) for 1987 that is attributable to the unreported embezzlement income and those erroneous deductions

---

[22](...continued)
6013(e)(4), and we assume that the parties agree that that section is satisfied with respect to any liability attributable to the erroneous deductions in question.

and (b) for each of the years 1988 and 1989 that is attributable to the unreported embezzlement income; and (3) that, under the facts and circumstances presented here, it is not inequitable under section 6013(e)(1)(D) to hold petitioner liable for the portion of the deficiency (a) for 1987 that is attributable to that embezzlement income and those erroneous deductions and (b) for each of the years 1988 and 1989 that is attributable to that embezzlement income.

### Unreported Embezzlement Income

#### Section 6013(e)(1)(C)

In cases involving omissions of income, such as the issue presented here involving the unreported embezzlement income, the courts have consistently held that the knowledge contemplated by section 6013(e)(1)(C) is knowledge of the underlying transaction, and not of the tax consequences of that transaction. Quinn v. Commissioner, 524 F.2d 617, 626 (7th Cir. 1975), affg. 62 T.C. 223 (1974); see Resser v. Commissioner, supra at 1535. In evaluating whether petitioner had no reason to know that there was a substantial understatement within the meaning of section 6013(e)(1)(C), the Court must inquire whether a reasonably prudent person, under the circumstances of petitioner, could have been expected to know at the time of signing each of the returns in question that each such return contained a substantial under-statement or that further investigation was warranted. Resser v.

Commissioner, supra at 1536; Bokum v. Commissioner, 94 T.C. 126, 148 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). A spouse may have a duty to inquire further if he or she knows enough facts so as to be placed on notice of the possibility of a substantial understatement. Guth v. Commissioner, 897 F.2d 441, 444-445 (9th Cir. 1990), affg. T.C. Memo. 1987-522.

Factors to be considered in determining whether petitioner had no reason to know within the meaning of section 6013(e)(1)(C)

> include the spouse's level of education; the spouse's in-
> volvement in the financial and business activities of the
> family; any substantial unexplained increase in the
> family's standard of living; and the culpable spouse's
> evasiveness and deceit about the family's finances. * * *
> [Resser v. Commissioner, supra at 1536.]

According to the notice, Mr. Morris embezzled $102,972.40, $128,092.34, and $129,046.26 during the years 1987, 1988, and 1989, respectively, and, of the total embezzled funds, reported $32,425 as gross receipts of Accu-Data during 1987, $54,907.13 as the aggregate gross receipts of Accu-Data and Meadows during 1988, and $85,944.95 as the aggregate gross receipts of Accu-Data and Meadows during 1989.

During the years at issue, Mr. Morris deposited all of the embezzled funds into the bank accounts of the following corpora-tions and other entities that he controlled: Accu-Data, Trust 768, Meadows, and MCIC. Checks drawn on those accounts were received by or were expended on behalf of petitioner during those years, as follows:

| Entities Controlled By Mr. Morris | 1987 | 1988 | 1989 |
|---|---|---|---|
| Accu-Data | $11,775.00 | $21,875.00 | $6,350.00 |
| Trust 768 | -- | 3,969.91 | -- |
| Meadows | -- | 750.00 | 9,974.00 |
| MCIC | -- | 4,550.00 | 1,820.00 |
| Total | 11,775.00 | 31,144.91 | 18,144.00 |

In addition, during 1988, checks drawn by Mr. Morris on the Trust 768 account totaling $19,864.72 were used to pay the joint Federal and State income tax liabilities that Mr. Morris and petitioner owed for 1986 and 1988.

The focus of the disagreement of the parties under section 6013(e)(1)(C) is on the funds derived from the bank accounts of Accu-Data, Trust 768, Meadows, and MCIC that were received by or expended on behalf of petitioner during the years at issue. We have found that those funds totaled $11,775, $51,009.63, and $18,144 during 1987, 1988, and 1989, respectively.[23] Respondent

[23] We were unable to find on the record before us, as respondent contends, that petitioner also benefited during 1987 from payments totaling $5,225.60 that Accu-Data made to GMAC on a loan that financed the family car or that during 1988 and 1989 all of the funds deposited into the Meadows account at the Champaign National Bank and the Meadows account at the National Bank of Monticello were available to petitioner. With respect to the Accu-Data payments to GMAC during 1987, although petitioner does not dispute that those payments were made, she contends that they were not made for the purpose alleged by respondent. We have found that Accu-Data made three payments to GMAC, each in the amount of $250.32, on July 10, Aug. 6, and Sept. 10, 1987, and that it also paid GMAC $4,464.64 and $10 on Sept. 11 and 24, 1987, respectively. We have further found that petitioner wrote a check to GMAC in each of the months January through May 1987 in the amount of $250.32 and in June 1987 in the amount of $250.31. Although it appears that Accu-Data assumed payments on a loan from GMAC that petitioner had been paying, there is no evidence

(continued...)

contends that those funds were significant enough that, under the circumstances surrounding petitioner, she should have been put on notice that an inquiry or investigation into the source of those funds was warranted. Because petitioner did not make any such inquiry, respondent argues that she should be held responsible. Petitioner disagrees.

---

[23](...continued)
in the record that establishes why Accu-Data made those payments to GMAC during 1987 or that petitioner in any way benefited from those payments. Petitioner testified that on May 12, 1987, she purchased a 1987 Sunbird, which was the only car available to her at that time, by making a downpayment of $6,263.50 and borrowed the balance of the purchase price for that car. Since petitioner did not purchase the 1987 Sunbird until May 12, 1987, the monthly payments that she made to GMAC during the period January through May 1987 could not have related to that car. It appears that the probable source of the funds that petitioner used to make the downpayment on that Sunbird was Accu-Data. However, we have found that checks totaling at least $11,775 that were drawn on the Accu-Data account were paid to the order of petitioner, Mr. Morris, or cash and represented amounts received by or expended on behalf of petitioner during 1987 and that petitioner included at least $11,450 of those checks in the deposits analysis that she prepared for 1987.

With respect to the availability to petitioner during 1988 and 1989 of the funds in certain bank accounts of Meadows, although petitioner was a signatory on both of those accounts and signed a check for $100 drawn on the Meadows account at the Champaign National Bank to pay the premium on a liability insurance policy for the Illinois land, we have found that during the years at issue Mr. Morris controlled the affairs of Meadows and that petitioner was not involved in its day-to-day operations. We believe petitioner's testimony that, to her knowledge, she did not sign any other checks drawn on the Meadows bank accounts. In this regard, although petitioner and Mr. Morris opened a savings account at American Savings during 1989 by depositing $20,000 from the joint checking and/or savings accounts and $15,000 from the Meadows account at the National Bank of Monticello, petitioner testified that the money deposited into that account was used by Meadows for the gravel pit and that she did not receive any of that money.

We note initially that, in the Schedules E of the joint returns that petitioner and Mr. Morris filed for 1988 and 1989, they reported aggregate income from Accu-Data and Meadows of $24,929 and $18,987, respectively. Consequently, the funds derived from certain bank accounts of Accu-Data, Trust 768, Meadows, and MCIC that were received by or expended on behalf of petitioner during the years at issue exceeded the amounts of any income of such entities that were reported in the joint returns for 1987 and 1988 (excess funds) by $11,775 and $26,080.63, respectively, and did not exceed the amount of such income reported in the joint return for 1989. On the instant record, we find that it was not unreasonable for petitioner not to have inquired into the source of the funds derived from the bank accounts of Accu-Data, Trust 768, Meadows, and MCIC that were received by or expended on behalf of petitioner during 1987, 1988, and 1989 to the extent that the joint returns for those years included income from those entities.

The question we must now resolve is whether the excess funds for 1987 and 1988 were significant enough that, under the circumstances surrounding petitioner, she should have investigated the source of those funds.[24] Based on our examination of the entire record before us, we find that petitioner had no reason to believe that (1) the $11,775 of excess funds derived from the

---

[24] We are limiting our inquiry to 1987 and 1988 because there were no excess funds for 1989.

Accu-Data account during 1987 and (2) the $26,080.63 of excess funds derived from the bank accounts of Accu-Data, Trust 768, Meadows, and MCIC during 1988 that were received by or were expended on behalf of petitioner during those years were funds that Mr. Morris embezzled from John Kenny Company or that further investigation was warranted into the source of those funds.

Although petitioner was responsible during the years at issue for handling the family finances and although she deposited checks and other funds, some of which were derived from the bank accounts of Accu-Data, Trust 768, Meadows, and MCIC, into the joint checking and/or savings accounts and used the funds in those accounts to pay the family bills, Mr. Morris took affirmative steps to deceive petitioner and otherwise to prevent her discovery of the embezzled funds. And he was successful not only in deceiving petitioner, but also in deceiving John Kenny Company from which he had been embezzling funds throughout a period that commenced several years prior to the years at issue and that continued throughout those years. Indeed, it was not until around late January 1991, well after petitioner signed the joint return for each of the years at issue, that petitioner and John Kenny Company even discovered Mr. Morris' prior embezzlement activities.

Mr. Morris spent evenings and many weekends away from home at an office in an apartment complex and led petitioner to believe that he was working while away from home not only for

John Kenny Company, but also for Accu-Data on accounting and tax preparation matters. Although Mr. Morris discussed his employment with petitioner in terms of the people with whom he worked, he generally did not inform her about what he actually did in his employment. Mr. Morris was not open with petitioner about his financial affairs, and, when she questioned him about those matters, he reacted negatively, causing her to discontinue that line of inquiry.

Under the circumstances presented here, we find that it was not unreasonable for petitioner, who had no involvement with Accu-Data, to have believed that during the years at issue Accu-Data generated significant funds from an accounting and tax preparation business.[25] We further find that, under those circumstances, it was not unreasonable for petitioner to have believed that during those years Meadows was capable of generating significant amounts of gross receipts from the sale of sand and gravel.[26] We have found that Mr. Morris controlled the affairs of Meadows during the years at issue, that petitioner was not involved in its day-to-day operations during those years, and that she was not in a position to know how much income Meadows

---

[25] In fact, Accu-Data reported gross receipts of (1) $35,210 and $31,687 in its Forms 1120-A for its taxable years ended June 30, 1987, and June 30, 1988, (2) $20,647 in its Form 1120S for its short taxable year July 1 through Dec. 31, 1988, and (3) $6,000 in its Form 1120S for its taxable year 1989.

[26] In fact, Meadows reported $22,482 and $86,355 of gross receipts in the Forms 1120S that it filed for 1988 and 1989.

generated from those operations during those years.

As for the checks drawn during 1988 from the Trust 768 account in the amount of $3,969.91 and from the MCIC account in the amount of $4,550 that were received by or expended on behalf of petitioner, under the circumstances presented here, we do not think that petitioner should have inquired further about the source of those funds, especially since Mr. Morris controlled the affairs of those entities. Indeed, we believe that any attempt by petitioner to inquire further about the source of any of the excess funds in question (or about any funds of Accu-Data, Trust 768, Meadows, and MCIC which she received or from which she benefited during the years at issue) or about the possibility of a substantial understatement in any of the joint returns in question would have been resisted by Mr. Morris and would have been fruitless.

Respondent contends that petitioner's level of education was such that she should have investigated further about the excess funds from the bank accounts of Accu-Data, Trust 768, Meadows, and MCIC during 1987 and 1988 totaling $11,775 and $26,080.63, respectively. We disagree. Not only did Mr. Morris control the affairs of those entities, take affirmative steps to deceive and otherwise prevent petitioner's discovery of the embezzled funds, and refuse to be open with her about his financial affairs, he also prepared the joint returns in question, as well as at least some of the returns covering the years at issue that were filed

by the entities that he controlled. Although petitioner cannot turn a blind eye to the joint returns in question, Bokum v. Commissioner, 94 T.C. at 148, she relied on Mr. Morris to prepare those returns because he was a former revenue agent and an accountant, she had confidence in his ability to prepare those returns properly, and, as far as she knew, Mr. Morris never received any complaints about the returns that he prepared for others.

In this connection, we note that the tax consequences of distributions by, and the operations of, corporations and trusts are not matters that we would expect petitioner to know because of her level of education.[27] Distributions (1) to stockholders from corporations[28] and (2) to beneficiaries from trusts[29] are not

---

[27] Petitioner earned a degree from Parkland College during 1987, and her course work there included two basic accounting courses. She entered the University of Illinois in the fall of 1987 and took courses there for two years before she withdrew, including two intermediate accounting courses.

[28] Accu-Data was a C corporation, and not an S corporation, during the period January 1987 through June 1988. During the period July 1988 through December 1989, Accu-Data was an S corporation, as was Meadows throughout 1988 and 1989. Except for maintaining a checking account at the Champaign National Bank, MCIC conducted no activities during the years at issue, and it does not appear that it filed any income tax returns for those years.

[29] The record does not disclose how Trust 768 should have been treated for Federal income tax purposes during the years at issue. However, it does establish that beneficial interests in that trust were held by petitioner and Mr. Morris starting with its creation at the end of November 1987 through the middle of June 1988, when they assigned their interest to Meadows. Except
(continued...)

necessarily taxable. A loan by a corporation to a stockholder or by a trust to a beneficiary is generally not taxable unless forgiven. Generally, only distributions to stockholders by a C corporation out of its earnings and profits are taxable. See secs. 301, 316(a). Nor does the stockholder of an S corporation necessarily have taxable income attributable to distributions received from and/or the operations of that corporation. That is because of the different and, at times, complex rules in subchapter S of the Code. Generally, an S corporation is not subject to tax, see sec. 1363(a), but each stockholder of an S corporation must take into account in such stockholder's income tax return for the year in which the taxable year of the S corporation ends, inter alia, such stockholder's pro rata share of that S corporation's items of income, loss, and deduction, see sec. 1366(a)(1)(A). Moreover, a distribution of property by an S corporation to a stockholder is not necessarily taxable. See sec. 1368. Finally, a distribution to a beneficiary from a trust subject to subchapter J of the Code is not necessarily taxable to that beneficiary. That is because of the different and, at times, complex rules in subchapter J of the Code. For example, a

---

[29](...continued)
for its purchase of the Illinois land in February 1988 in respect of which it borrowed $50,000 from the Champaign National Bank, Trust 768 conducted no activities during the years at issue except for maintaining an account at that bank. We assume for discussion purposes that it was subject to subchapter J of the Code.

distribution by a trust to a beneficiary is generally taxable only to the extent of distributable net income. See secs. 652, 662.

Under the circumstances presented here, we do not think that it was unreasonable that petitioner did not ask Mr. Morris about the tax consequences of the distributions by and/or the operations of Accu-Data, Trust 768, Meadows, and MCIC, but instead relied on him to prepare correctly the joint returns in question and the returns that he prepared for the entities that he controlled.

Additional circumstances that we believe justify petitioner's not inquiring about the possibility of substantial understatements in the joint returns in question are that, in addition to her responsibilities for handling the family finances during the years at issue, petitioner also was preoccupied during those years as a homemaker, mother, and part-time student. She was taking classes at either Parkland College or the University of Illinois until the spring of 1989. At that time, she withdrew from college because it was consuming too much of her time during a period when she wanted and believed that she had to, and did in fact, devote more time to her children who were experiencing serious problems.

It is also significant to us that there is no suggestion in the record in this case that petitioner was living lavishly during the years at issue or that her living conditions signifi-

cantly improved during those years. Petitioner's family expenditures during the years at issue were not lavish compared to her standard of living during the years prior to those years.[30] Although petitioner and Mr. Morris made two large expenditures during 1987, viz., paying off the $17,560.77 mortgage on their house and paying $20,000 toward the purchase of the Illinois land, the source of the funds used to make those expenditures was the $40,000 bonus that Mr. Morris received during 1987.[31]

Based on our examination of the entire record in this case, we are persuaded, and we find, that a reasonably prudent person, under the circumstances of petitioner, could not have been expected to know at the time she signed each of the joint returns in question that each such return contained a substantial understatement attributable to the unreported embezzlement income or

---

[30] We note that Mr. Morris began embezzling funds from John Kenny Company several years prior to the years at issue, and there is no reason to believe that petitioner's standard of living improved during the years at issue as a result of the embezzled funds.

[31] Respondent further contends, and petitioner concedes, that Mr. Morris transferred to petitioner ownership of a life insurance policy that had a cash value of $15,000. Apparently, it is respondent's view that that transfer should have caused petitioner to investigate further whether the joint returns in question contained substantial understatements. We disagree. It is unclear from the record when Mr. Morris transferred ownership of that policy to petitioner. Nor does the record disclose the source of the premium payments on that policy. Petitioner testified that during the years at issue she paid the premiums for a life insurance policy with funds in the joint checking and/or savings accounts, but it is not clear from the record whether those premiums were for the policy, ownership of which Mr. Morris transferred to her.

that further investigation was warranted.  We further find that at that time petitioner did not know, and had no reason to know, within the meaning of section 6013(e)(1)(C) that there was a substantial understatement in each of those joint returns that was attributable to the unreported embezzlement income.

Section 6013(e)(1)(D)

In determining whether it is inequitable under section 6013(e)(1)(D) to hold a taxpayer claiming innocent spouse relief liable for the deficiency attributable to a substantial understatement, we must examine all the relevant facts and circumstances, including whether the taxpayer claiming innocent spouse relief received significant benefits as a result of the items omitted from gross income, whether that taxpayer participated in any wrongdoing, and whether that taxpayer has since divorced the culpable spouse.  Resser v. Commissioner, 74 F.3d at 1543; see sec. 1.6013-5(b), Income Tax Regs.  In determining whether the taxpayer received significant benefits from the items omitted from gross income, normal support, as measured by the taxpayer's circumstances, is not considered a significant benefit.  Resser v. Commissioner, supra at 1543.

There is no evidence in the record to support a finding that petitioner and her family received other than normal support during the years at issue.  Petitioner testified, and we found, that her family expenditures during those years were not lavish compared to her expenses during years prior to those years.

Respondent did not provide any evidence that negates that testimony or that shows that the family expenditures were extraordinary during the years at issue.

We also find it important that although funds of Accu-Data, Trust 768, Meadows, and MCIC totaling $11,775, $51,009.63, and $18,144 were received by or expended on behalf of petitioner during 1987, 1988, and 1989, respectively,[32] respondent determined in the notice that Mr. Morris' unreported embezzlement income was $70,547 for 1987, $73,185 for 1988, and $43,101 for 1989. In addition, the excess funds which petitioner received from those entities or from which she benefited totaled only $11,775 for 1987 and $26,080.63 for 1988, and there were no excess funds for 1989. On the record before us, we believe that it would be inequitable to hold petitioner liable for the portion of the deficiency for each of the years at issue that is attributable to unreported embezzlement income when that income (1) for 1987 and 1989 substantially exceeds the funds of Accu-Data, Trust 768, Meadows, and MCIC that were expended by or on behalf of petitioner during each of those years and (2) for 1987 and 1988 substantially exceeds the excess funds that she received or that were expended on her behalf during each of those years.[33]

---

[32] Petitioner did not receive or have expended on her behalf any unreported embezzled funds for 1989.

[33] We note that petitioner did not receive or have expended on her behalf during any year at issue embezzled funds that exceeded

(continued...)

It is also significant that petitioner did not in any way participate in Mr. Morris' embezzlement schemes.  Mr. Morris went to great lengths to deceive petitioner into believing that the funds to which she had access during the years at issue and which he, unbeknownst to her, had embezzled were from legitimate sources.

Another important factor under section 6013(e)(1)(D) is that in August 1991, about six months after petitioner discovered that Mr. Morris had been embezzling funds, petitioner and Mr. Morris were divorced.  The reason for the divorce was primarily attributable to Mr. Morris' embezzlement activities.

Based on our review of the entire record before us, we find that it would be inequitable within the meaning of section 6013(e)(1)(D) to hold petitioner liable for the portion of the deficiency for each of the years at issue that is attributable to the unreported embezzlement income.

For the foregoing reasons, we hold that petitioner qualifies for innocent spouse relief under section 6013(e) with respect to

---

[33](...continued)
the aggregate amount of embezzled funds that respondent determined had been reported as gross receipts in the Federal income tax returns filed by Accu-Data and Meadows with respect to each such year.

It is also noteworthy that John Kenny Company received the Illinois land in connection with the settlement of the lawsuit that it instituted against Mr. Morris and petitioner.  Thus, petitioner did not benefit from the embezzled funds to the extent of the value of that land.  See Schwimmer v. Commissioner, T.C. Memo. 1996-353.

the portion of deficiency for each of the years at issue that is attributable to the unreported embezzlement income.

Claimed Deductions

In order for a claimed deduction to be a grossly erroneous item under section 6013(e)(1)(B), there must be a "claim of a deduction * * * in an amount for which there is no basis in fact or law."  Sec. 6013(e)(2)(B).  In Douglas v. Commissioner, 86 T.C. 758, 762-763 (1986), we construed the phrase "no basis in fact or law", as follows:

> As we read the statute as a whole and its legislative history, a deduction has no basis in fact when the expense for which the deduction is claimed was never, in fact, made.  A deduction has no basis in law when the expense, even if made, does not qualify as a deductible expense under well-settled legal principles or when no substantial legal argument can be made to support its deductibility.  Ordinarily, a deduction having no basis in fact or in law can be described as frivolous, fraudulent, or, to use the word of the committee report, phony. [Fn. ref. omitted.]

The mere fact that a deduction is disallowed does not mean that the deduction has no basis in fact or in law within the meaning of section 6013(e)(2)(B).  See id. at 763.

We are persuaded by the record before us that the deductions for a bad business debt and the legal expenses incurred in an attempt to recover that debt, which were claimed in the 1987 joint return and which petitioner concedes are erroneous, are not frivolous, fraudulent, or phony and that they have some basis in fact and in law within the meaning of section 6013(e)(2)(B).  The parties do not dispute that the loan underlying the bad debt

deduction (viz., the Galt loan) was in fact made, that that loan became worthless during 1987, or that legal expenses were incurred during that year in the amount claimed in an attempt to recover the proceeds of that loan.

With respect to the claimed deduction for a business bad debt, under section 166(a), a deduction is allowed for a business bad debt for the year during which it becomes worthless. If the debt is a nonbusiness debt, section 166(d)(1) provides that the loss from the worthlessness of the debt is to be treated as a short-term capital loss. Since the parties agree that the Galt loan was made and that it became worthless during 1987, the only issue concerning its deductibility is whether it was a business bad debt for which a deduction is allowed or a nonbusiness bad debt which is to be treated as a short-term capital loss. On the present record, we find that neither the characterization of the Galt loan as a business debt nor the deduction of that debt when it became worthless was frivolous, fraudulent, or phony. See Bokum v. Commissioner, 94 T.C. at 142.

Although the parties stipulated that Mr. Morris was not in the business of lending money during 1987, a person does not have to be in that business in order for a debt to be considered a business debt. A debt is considered a business debt if it was created or acquired in connection with a trade or business of the taxpayer or if the loss from its worthlessness is incurred in a trade or business. Sec. 166(d)(2). A debt is considered a

business debt if it is proximately related to a taxpayer's trade or business. Sec. 1.166-5(b), Income Tax Regs.; see Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979). To illustrate, if the dominant motivation of a person in making a loan to a corporation of which he is both a stockholder and an employee is to secure such person's employment, and not to preserve such person's investment, the loan will be considered a business debt. See Garner v. Commissioner, 987 F.2d 267, 269 (5th Cir. 1993), affg. T.C. Memo. 1991-569.

Mr. Morris testified that the purpose of the Galt loan was to assist Galt Communications in the early stages of its operations by providing it with money with which to pay its business expenses. He further testified, and we have found, that although he was not an employee of that company at the time he made the Galt loan, he hoped to secure future employment with it by making the loan at issue. Mr. Morris also testified that he believed that that loan was a business loan. Although Mr. Morris' testimony is insufficient to establish what his dominant motivation was in making the Galt loan or whether his involvement with Galt Communications constituted a trade or business, it does show that some basis existed for believing that that loan was made primarily for business, and not investment, purposes. Accordingly, we find that there was some basis in fact and law to claim a deduction for the worthless Galt loan.

With respect to the claimed deduction for legal expenses

incurred to recover the Galt loan, the ordinary and necessary legal expenses incurred in attempting to recover a business debt may be deductible. See sec. 162(a). On the present record, we find that the claimed deduction for the legal expenses in question was not frivolous, fraudulent, or phony. The record discloses that there was some basis for Mr. Morris' belief that the Galt loan was a business loan and that the legal expenses incurred in attempting to collect that loan were deductible. Accordingly, we find that there was some basis in fact and law to claim a deduction for those expenses.

Based on our review of the record before us, we find that petitioner has failed to prove that there was no basis in fact or law within the meaning of section 6013(e)(2)(B) for the claimed deductions for 1987 for a business bad debt and the legal expenses incurred in attempting to recover that debt. We further find that petitioner failed to show that those deductions are grossly erroneous items under section 6013(e)(1)(B). Accordingly, we find that petitioner is not entitled to innocent spouse relief under section 6013(e) with respect to the portion of the deficiency for 1987 that is attributable to the disallowance of the deductions in question.[34]

---

[34] In light of our holding that the claimed deductions for 1987 are not grossly erroneous items under sec. 6013(e)(1)(B), we shall not address whether petitioner satisfies sec. 6013(e)(1)(C) and (D) with respect to the portion of the deficiency for 1987 that is attributable to those deductions.

Meadows--Gross Income

Respondent determined that petitioner and Mr. Morris under-reported by $10,000 their gross income for 1989 that is attributable to Meadows, an S corporation. In the Form 1120S that Meadows filed for that year, it showed $29,112 of ordinary income. However, in the 1989 joint return that petitioner and Mr. Morris filed, they reported income from Meadows of only $19,112.

Petitioner contends that the gross receipts, and therefore the ordinary income, reported in the Form 1120S that Meadows filed for 1989 were overstated by $10,000 and that the 1989 joint return in question therefore correctly reflected income from Meadows of only $19,112. To support that contention, petitioner relies on Mr. Morris' testimony and a purported reconciliation of Meadows' gross income for 1989 that he prepared and that purported to show the amount and source of the $86,355 of gross receipts that Meadows reported in its Form 1120S for that year. Mr. Morris included in that reconciliation purported deposits in the Meadows account at the Champaign National Bank of $21,000 and $23,000 on April 6, 1989, and April 26, 1989, respectively. According to Mr. Morris, the $23,000 deposited on April 26, 1989, into the Meadows account at the Champaign National Bank included $10,000 that had previously been included in a deposit of $21,000 that was made into that account on April 6, 1989.

On April 6, 1989, a deposit of $21,000 attributable to a check drawn on the MCIC account was made into the Meadows account at the Champaign National Bank. A $10,000 check drawn on that Meadows account and payable to Mr. Morris cleared that account on April 17, 1989. That $10,000 check and a $16,500 check drawn on the MCIC account and payable to Mr. Morris were deposited on April 14, 1989, into the Bloomington Federal account. On April 26, 1989, a $23,000 check drawn on the Bloomington Federal account was deposited into the Meadows account at the Champaign National Bank.

We are not persuaded by, and are unwilling to rely on, Mr. Morris' testimony or the purported reconciliation that he pre-pared to establish that the gross receipts of Meadows shown in the Form 1120S that it filed for 1989 were overstated by $10,000. In this connection, it is not clear to us that $10,000 of the $23,000 deposited into the Meadows account on April 26, 1989, was the same $10,000 previously deposited into and thereafter dis-bursed from that account.

Based on our review of the instant record, we find that petitioner has failed to prove that the gross receipts, and therefore the ordinary income, of Meadows for 1989 were over-stated by $10,000 in the Form 1120S that it filed for that year. We further find that petitioner and Mr. Morris underreported by $10,000 their gross income from Meadows for that year. We therefore sustain respondent on this issue.

Accu-Data--Constructive Distribution

Respondent contends that during 1989 Mr. Morris received a constructive dividend from Accu-Data in the amount of $11,504, which was the amount of the year-end total retained earnings of Accu-Data that was reflected in the balance sheet in the Form 1120S that it filed for 1988.  Although petitioner does not dispute that during 1989 Mr. Morris received a constructive distribution of $11,504 from Accu-Data, she contends that the amount of that distribution that constitutes a dividend is limited to $4,287, since that was the amount of Accu-Data's total retained earnings at the time of that distribution.

To support that contention, petitioner asserts that during 1981 and 1982 Accu-Data, a stockholder of TPI, lent TPI a total of $12,300, that those alleged loans became worthless sometime thereafter but prior to 1989, and that Accu-Data's earnings and profits as of the beginning of 1989 must be reduced to reflect that worthless debt.  Respondent counters that the $12,300 that Accu-Data transferred to TPI was a contribution to its capital.

The only items of evidence supporting petitioner's contention that Accu-Data lent TPI $12,300 are Mr. Morris' testimony, a purported reconciliation that he prepared, and some checks and bank statements.  We are not persuaded by, and are unwilling to rely on, that evidence to establish that Accu-Data lent TPI a total of $12,300, rather than contributing that amount to its capital.  In this regard, we note that TPI was not a stockholder

of Accu-Data.  Consequently, the stockholder loan account asset reflected on the balance sheets that were contained in the Forms 1120-A and 1120S that Accu-Data filed for relevant years could not have described a loan from Accu-Data to TPI.[35]

Based on our review of the record before us, we find that petitioner has failed to prove that Mr. Morris did not receive a constructive dividend from Accu-Data during 1989 in the amount of $11,504.  We therefore sustain respondent on that issue.

Statute of Limitations

Petitioner contends that the period of limitations pre-scribed by section 6501(a), and not the period of limitations prescribed by section 6501(c), applies to the assessment of a deficiency against her for 1987 and that that period had expired prior to the date on which respondent issued the notice for that year.  Petitioner's contention is apparently based on her reading of section 6501(c)(1) which applies "In the case of a false or fraudulent return with the intent to evade tax".  It is peti-tioner's position that since she did not intend to evade tax when she signed the 1987 joint return, section 6501(c)(1) does not apply to her.

---

[35]  We also note that the balance sheet in the Form 1120-A filed by Accu-Data for the taxable year that ended June 30, 1987, showed that the stockholder loan account increased from $4,394 to $7,217 during that year.  Assuming arguendo that that asset related to a loan or loans made by Accu-Data to TPI during 1981 and 1982, it should not have increased during the period July 1, 1986, through June 30, 1987, especially since TPI was dissolved on Feb. 1. 1986, and Mr. Morris testified that TPI was basically defunct around 1984 and 1985.

Petitioner's contention is without merit.  Petitioner concedes that the underpayment in the joint return for 1987 was attributable to Mr. Morris' fraudulent intent.  Consequently, the period of limitations is extended indefinitely for that year, and respondent may assess the tax due for 1987 at any time against petitioner and/or Mr. Morris.  <u>Vannaman v. Commissioner</u>, 54 T.C. 1011, 1016-1018 (1970); see sec. 6501(c)(1); accord <u>Benjamin v. Commissioner</u>, 66 T.C. 1084, 1100 (1976), affd. 592 F.2d 1259 (5th Cir. 1979).

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.